[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-12366
Non-Argument Calendar
_____

D.C. Docket No. 1:12-cr-20749-UU-9


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

MARTA GONZALEZ,
RENE SUAREZ-BASANTA,

Defendants - Appellants.


_____

No. 13-12546
Non-Argument Calendar
_____

D.C. Docket No.  1:12-cr-20749-UU-2


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JORGE SELL,

Defendant - Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(May 21, 2014)

Before TJOFLAT, PRYOR and JORDAN, Circuit Judges.

PER CURIAM:

This consolidated appeal follows the convictions of Marta Gonzalez, Rene Suarez-Basanta, and Jorge Sell for their roles in a conspiracy to defraud Medicare in which Safe Home Health Care Agency, Inc., paid kickbacks to persons for referring or serving as patients for in-home health care services. Gonzalez challenges on two grounds her sentence of 15 months of imprisonment for one count of conspiring to pay and receive kickbacks in connection with a federal health care program, see 18 U.S.C. § 371; 42 U.S.C. § 1320a-7b(b)(1), (2), and two counts of receiving kickbacks, see 42 U.S.C. § 1320a-7b(b)(1)(A), (B). Suarez challenges on three grounds his conviction for conspiring to pay and receive health care kickbacks and his sentence of 12 months of imprisonment. Sells challenges on three grounds his sentence of 97 months of imprisonment imposed following

his pleas of guilty to conspiring to pay and receive health care kickbacks, see 8 U.S.C. § 371; 42 U.S.C. § 1320a-7b(b)(1), (2), and paying a kickback in connection with a federal health care program, see 42 U.S.C. § 1320a-7b(b)(1)(A), (B).  We affirm.

The district court did not clearly err in determining that the improper benefit derived by Gonzalez's kickbacks included the disbursements made by Medicare for treatments for her and her parents.  When Medicare fraud is effectuated using bribery or kickbacks, a defendant is subject to a specific offense increase if the "value of the improper benefit" conferred exceeds $5,000.  United States Sentencing Guidelines Manual § 2B4.1(b)(1)(B) (Nov. 2012).  The value of the improper benefit equals the "value of the action . . . effected in return for the [kickback]."  See id. §§ 2B4.1 cmt. n.2; 2C1.1 cmt. n.3.  Gonzalez received kickbacks for serving as a patient and for referring her parents, and Safe Home, in return, profited about $52,000.  Because Gonzalez does not dispute the amount of the value of the improper benefit, and that amount was greater than $30,000 and less than $70,000, she was subject to a six-level enhancement of her sentence.  See id. §§ 2B4.1(b)(1)(B), 2B1.1(b)(1)(D), (E).

Gonzalez argues that the health care services provided to her parents were medically necessary and should be excluded from the calculation, but we disagree.  Medically necessary services may be excluded when calculating "loss" attributable

3

to Medicare fraud because the agency presumably would have paid for the services in the absence of the fraud, but the medical services received by Gonzalez's parents were "effected in return for" the illegal kickbacks paid to Gonzalez and were part of "the value of the improper benefit" conferred on Safe Home. See id. § 2B4.1 cmt. n.2.

The district court also did not clearly err by denying Gonzalez a reduction for playing a minor role in the conspiracy. A defendant may be entitled to a two-level reduction in her base offense level if she was a "minor participant" in the criminal activity. See id. § 3B1.2(b). To determine whether a defendant was a minor participant, "the district court must measure the defendant's role against the relevant conduct for which she was held accountable at sentencing." United States v. Rodriguez De Varon, 175 F.3d 930, 945 (11th Cir. 1999). Gonzalez was held accountable for the improper benefit derived from only her actions, not those of her coconspirators, so she was not entitled to a reduction on the ground that her actual conduct was less than her relevant conduct. Gonzalez argues that she was less culpable than her coconspirators, but the district court was not required to measure Gonzalez's role against those of her coconspirators when she was not a minor participant with respect to the conduct for which she was held responsible. See id. at 944–45 (recognizing that the comparison between the defendant's relevant conduct and actual conduct can "be dispositive" and that the district court

4

is not required, but "may also measure the defendant's role against the other participants").

The district court did not violate Suarez's right to present evidence in his defense by denying his motion to depose Dr. Juan Carlos Ojea. A defendant has the right to call witnesses in his defense, under both the Sixth Amendment and the Due Process Clause of the Fifth Amendment, but "the proffered evidence . . . [must] bear a logical relationship to an element of the offense or an affirmative defense." United States v. Hurn, 368 F.3d 1359, 1365 (11th Cir. 2004). Suarez argued that he thought persons who were not homebound could receive home health care, and he sought to establish that belief was reasonable through Ojea's testimony that he would prescribe home health care to people who did not qualify as homebound. Suarez's belief about a person's eligibility for Medicare "bear[s] no logical relationship" to whether he knew it was illegal to accept kickbacks for patients for home health care services. See id.

The district court did not abuse its discretion by denying Suarez's request for a jury instruction on entrapment. "Entrapment is an affirmative defense and requires a defendant to prove that, but for the persuasion or mild coercion of the government, he would not have committed the crime." United States v. Louis, 559 F.3d 1220, 1224 (11th Cir. 2009). When asked about kickbacks by a government informant who had previously solicited Suarez's assistance to defraud Medicare,

5

Suarez offered to introduce the informant to a coconspirator in exchange for a small portion of the kickback. At trial, the government introduced recordings of the informant's telephone calls to Suarez in which the two men discussed their financial arrangement; Suarez mentioned another person who would pay more money for referrals; and Suarez boasted about referring 14 persons for therapy. Suarez argues that the informant contacted him, but the "mere suggestion of a crime or initiation of contact [was] not enough" to prove entrapment, see United States v. Brown, 43 F.3d 618, 623 (11th Cir. 1995). Because Suarez failed to establish that he was persuaded or coerced to participate in the conspiracy, he was not entitled to a jury instruction on entrapment.

The district court did not clearly err in finding that Suarez's medical treatments were unnecessary and ordering him to pay restitution for those treatments. A defendant is required to pay restitution to any victim who suffers pecuniary loss. 18 U.S.C. § 3663A(a)(1), (c). After Suarez objected to the presentence investigation report on the ground that "there [was] no evidence . . . that the medical services . . . [he] received were medically improper," the government responded that Suarez "was not home bound" as "proven by the recording where he drove himself to [a] meeting" while he "was purportedly receiving home health services." The government also presented expert testimony at trial that, to qualify as "homebound" under Medicare regulations, a patient must

6

be unable to leave his home except to make infrequent trips, such as to a doctor, and that those trips must involve considerable effort.  The record supports the finding of the district court that Suarez's medical treatments were unnecessary.

The district court did not clearly err in calculating the amount of the improper benefit attributable to Sell.  Sell argues that the district court failed to make a reasonable estimate of the Medicare disbursements related to Sell's kickbacks and the direct costs to Safe Home related to those disbursements, but we disagree.  During the sentencing hearing, the district court made a reasonable estimate of the improper benefit based on reliable and specific testimony from Sell's conconspirator and the owner of Safe Home, Maria Rueda, that 70 to 80 percent of the business was "fraudulent or tied to kickbacks," and from a federal agent, Fernando Porras, that, of the 479 patients of Safe Home who received kickbacks for physical therapy services, 420 received 1,104 sessions of therapy for which Medicare paid $5,825,643, but that cost Safe Home only $1,413,120 to provide.  See United States v. DeVegter, 439 F.3d 1299, 1304 (11th Cir. 2006).  Because Sell's improper benefit of $4,412,523 was greater than $2.5 million and less than $7 million, he was subject to an 18-level enhancement of his sentence.  See U.S.S.G. §§ 2B4.1(b)(1)(B), 2B1.1(b)(1)(J), (K).  Sell argues that Porras's calculation is incomplete because it failed to account for additional direct costs to Safe Home, but those costs were attributable to other health care services; would

7

have had to be offset by the payments made by Medicare for those other services; and would have increased the amount of the improper benefit. The district court did not clearly err by calculating the improper benefit based solely on the benefits and costs connected to physical therapy and attributing that net amount to Sell.

The district court also did not clearly err when it denied Sell a reduction for acceptance of responsibility. A defendant may qualify for a two-level reduction of his base offense level when he "clearly demonstrates acceptance of responsibility for his offense," U.S.S.G. § 3E1.1(a), such as by entering a change of plea and then "truthfully admitting the conduct comprising the offense of conviction[] and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable," id. cmt. n.3. Sell argues that that the district court denied the reduction "to punish [him] for the vigorous advocacy of his attorney," but the district court explained that it denied the reduction because Sell had, since entering his change of plea, done everything "to minimize his involvement, to conceal the scope of his involvement at Safe Home, to try to isolate his participation to solely paying a kickback or two to Arminda Reyes," and had not made "any effort to come clean . . . [or show any] remorse." The record supports that finding. Sell argued that that he had paid kickbacks only to Reyes at Rueda's behest, had not exerted control over coconspirators, had no contact with patients, and had provided legitimate home health care services, but the government refuted

8

each of those arguments.  At Sell's sentencing hearing, Reyes, Rueda, and a federal investigator, Luis Soler, testified that Sell had paid kickbacks to Reyes and to patients; provided Reyes names of patients and prompted her to reenlist those patients when they became eligible for additional services; trained Reyes how to coach patients and recruit new patients; instructed Rueda how to maintain the ledger for the business; falsified patient records to obtain higher payments from Medicare; managed the staff, patients, and billing; and decided which patients to treat.  The government also elicited from Agent Porras that, during debriefing, Sell admitted to paying kickbacks only on occasions when he was recorded doing so.  Sell, who falsely denied most of his relevant conduct, did not prove that he was entitled to a reduction for acceptance of responsibility.

The district court also did not clearly err when it enhanced Sell's sentence for his role as a supervisor.  The presentence investigation report recommended a three-level enhancement of Sell's sentence for being a supervisor in the criminal activity, but the district court instead decided to impose a two-level enhancement based on its findings that the criminal activity "involve[d] [less than] five . . . participants [and] was [not] otherwise extensive," see U.S.S.G. § 3B1.1(b), (c).  Sell oversaw Reyes's recruitment of patients and paid her kickbacks; instructed Rueda how to maintain business records; and assumed control over the employees and billing for Safe Home after Rueda became ill.  Sell argues that he cannot be

9

deemed a supervisor based on his oversight of Reyes because she was "a confidential informant for the government" instead of a "participant" in the conspiracy, see id. § 3B1.1 cmt. n.1&2, but the district court found that Sell's "relevant corrupt conduct . . . [began in] April 2010," and continued after Reyes's arrest on January 23, 2010, until the conspiracy ended on June 4, 2012. The district court was entitled to find that Sell supervised Reyes approximately 18 months before she became an informant.

We **AFFIRM** the convictions and sentences of Gonzalez, Suarez, and Sell.